**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CHARLES H. BUDDE,      ) | |
|     ) | |
|     Plaintiff,     ) | |
|     ) | |
|     v.     ) | No. 06 C 1165 |
|     ) | |
| KANE COUNTY FOREST PRESERVE,     ) | Judge Rebecca R. Pallmeyer |
|     ) | |
|     Defendant.     ) | |

### MEMORANDUM OPINION AND ORDER

On the evening of March 11, 2005, Plaintiff Charles Budde drank several glasses of wine before getting into his car to drive home. Budde rear-ended another car, damaging his own vehicle and sending the passengers of the other car to the hospital. At the time, Budde was the Chief of Police for Defendant, the Kane County Forest Preserve. Although he was off-duty at the time of the accident, Budde was nevertheless placed on administrative leave and ultimately fired by Defendant on June 7, 2005. After the drunk driving incident, Budde sought and received treatment for alcoholism. Plaintiff then filed this suit, claiming that Defendant violated his rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, by discriminating against him on the basis of a disability, alcoholism, and by refusing to provide him with a reasonable accommodation. Defendant moved for summary judgment, arguing that Plaintiff's termination was the result of both his failure to abide by department policy and his inability to perform his job after his license was revoked. For the reasons set forth below, Defendant's motion is granted.

### FACTUAL BACKGROUND

Budde was hired by the Forest Preserve to serve as Chief of Police in June 1991. (Budde Dep. at 9:19-10:7, Ex. B to Def.'s 56.1.) In his capacity as Chief, Budde authored General Order 92-09, which sets forth the job description of the Police Chief. (Def.'s 56.1 ¶ 3.) Near the top of the document is the heading "Essential Job Functions," and listed immediately underneath that heading is: "1. Operate an automobile." (*Id.*) In 1994, Budde himself implemented the District's Manual of

Standard Operating Procedures ("SOPs"). (*Id.* ¶ 4.) The SOPs state that "The following are applicable and prohibited to all employees and members of the Department and may be made subject of disciplinary action: . . . Violation or attempted violation of any Federal, State, County, or Municipal law." (SOP at 1.5.2, Ex. 18 to Budde Dep., Ex. B to Def.'s 56.1.) Additionally, "Being intoxicated in public while off duty is prohibited." (*Id.*)

On Friday, March 11, 2005, Budde drank four or five glasses of wine at the Moose Lodge. (Def.'s 56.1 ¶ 5.) Upon leaving, Budde drove his own car and rear-ended another car, seriously enough to send both the driver and passenger of that car to the hospital.[1] (*Id.* ¶¶ 5, 7.) Budde was found to have a blood alcohol level of .23, nearly three times the legal limit in Illinois of .08. (*Id.*)

The next day, Budde called Monica Meyers, the Executive Director of the District and Budde's immediate supervisor, to inform her about the incident and to let her know that he was not seriously hurt and would be at work on Monday. (*Id.* ¶¶ 2, 8.) The next week, on March 15, Budde explained the circumstances of the accident to Meyers in more detail and informed her that he might be charged with driving under the influence (a "DUI"). (*Id.* ¶ 9.) Meyers advised him to consider attending the Employee Assistance Program ("EAP"). (Meyers Dep. at 138:11-16., Ex. C to Def.'s 56.1.) According to Meyers, she did not refer him to this program because of any concerns about a drinking problem—she claims that Budde told her he did not have a problem with his drinking—but rather concerns about stress. (Def.'s 56.1 ¶ 11.) Budde claims that he told Meyers at this meeting that he had an alcohol problem and needed to talk to someone, and that she only recommended the EAP in response to that.[2] (Pl.'s 56.1 ¶ 23.) Later that week, as media scrutiny into the drunk driving incident heightened, Meyers consulted with the President of the

---

[1]    Nothing in the record states whether they suffered any serious injuries.

[2]    In fact, according to Budde, the EAP existed only for substance abuse problems and not for things such as employee stress. Neither party has presented any written evidence regarding the scope of the EAP program, however, so this fact remains disputed.

District's Board of Commissioners, John Hoscheit. (Pl.'s Resp. ¶ 2; Def.'s 56.1 ¶¶ 12, 13.) The two agreed that Budde would be placed on paid administrative leave. (Def.'s 56.1 ¶ 13.) While on administrative leave, Budde maintains that he contacted Tracey Smith, the Human Resources Manager for the District, to inform her of his status with EAP counseling and alcohol rehabilitation. (Pl.'s Resp. ¶¶ 2, 14.) Defendant denies this. (Def.'s Resp.¶ 25.)

By his own admission, Budde is an alcoholic. (Pl.'s 56.1 ¶ 9.) For forty-three years, until he made the conscious decision to get sober on June 1, 2005, Budde drank virtually every evening when he returned home from work until he passed out in a chair in front of the television. (*Id.* ¶ 12.) Budde also would drink himself to sleep on the weekends, and suffered frequent blackouts—at least one per week. (*Id.*) His dependence on alcohol caused numerous problems: he had difficulty sleeping, was unable to help care for his children, argued frequently with his wife and children, suffered from serious memory lapses, and saw his sexual relationship with his wife comprised. (*Id.* ¶ 14.) Ultimately, he and his wife divorced, but his drinking continued. (*Id.* ¶¶ 14-15.) Budde claims that he was unable to care for himself, had difficulty concentrating, and saw his relationships with others seriously affected by his drinking.[3] (*Id.* ¶¶ 16-19.) According to Budde, he received treatment at the Renz Addiction Center beginning in March 2005 and continuing periodically through August. (Budde Aff. ¶¶ 21-25, Ex. B to Pl.'s 56.1.) In addition, on May 31, 2005, Budde enrolled in Central DuPage Hospital's Behavioral Services alcohol rehabilitation partial day program through June 21, 2005, when he was discharged and told that his alcohol dependence was in remission. (*Id.* ¶ 27.) Budde claims that he told Smith about his enrollment both with Renz and with the Central DuPage Hospital program. Defendant denies this. (Def.'s Resp. ¶ 25.)

---

[3] As one example of his problems maintaining social relationships, Budde states that he became angry at his friends in May 2005 when they tried to convince him to seek treatment for his alcoholism. (Pl.'s 56.1 ¶ 19.) The court notes that Budde's account of his reaction casts some doubt on Budde's claim that on March 15 he voluntarily told Meyers that he had a drinking problem for which he needed treatment. (*Id.* ¶¶ 22-23.)

On June 7, 2005, Meyers sent Budde a letter informing him that he was being terminated. (Def.'s 56.1 ¶ 15.) The letter stated:

> The decision to terminate your employment was based on a number of factors all of which independently would justify termination. Those factors include a pattern of errors in judgment on your part, your inability to perform your duties as Director of Public Safety due to the suspension of your driving privileges, and engaging in conduct that is below the standard expected for this position.

(Ex. 6 to Budde Aff., Ex. B to Pl.'s 56.1.) Plaintiff had not yet been convicted of the DUI at the time he was terminated, but he does not dispute that his license had already been revoked. (*Id.* ¶ 17.)

According to Plaintiff, Defendant knew of his problems with alcohol well prior to the March 2005 accident. In May 2004, the District commenced an Administrative Inquiry into allegations made by Sergeant Rick Hayes that Budde was drinking on the job and having "liquid lunches." (Pl.'s 56.1 ¶ 29.) Budde denied the allegation, and Hayes later recanted. (Def.'s Resp. ¶ 28.) In February 2005, just before Budde's March accident, Meyers spoke to Budde about Budde's practice of driving to the Moose Lodge after work and parking his police vehicle there. (*Id.*) Budde informed her that the Lodge had a restaurant where he ate several nights a week. (*Id.*) Meyers nevertheless cautioned Budde against parking his police vehicle at the Lodge. (*Id.*)

Plaintiff also maintains that he was denied reasonable accommodations by Defendant. Prior to his termination, on May 20, 2005, Brick Van Der Snick, acting as Budde's attorney, approached someone at the Forest Preserve and suggested that he could drive Budde to work while his license was suspended and that Budde could ride with another officer in the event he needed to drive around during the day. (Pl.'s 56.1 ¶ 28.) According to Van Der Snick, Defendant did not respond to this suggestion. (*Id.*) Three days after his termination, Budde sent a letter to the Forest Preserve requesting an accommodation for a "perceived disability to wit: alcoholism." (Def.'s 56.1 ¶ 16.) Again, nothing came of this request.

After his termination, Plaintiff initiated a discrimination charge with the Equal Employment Opportunity Commission ("EEOC"), which issued Plaintiff a "right to sue" letter on November 29,

2005.  (Compl. ¶ 3.)   In this action, Plaintiff alleges that Defendant violated the ADA by discriminating against him for his disability, alcoholism, when they fired him; by failing to accommodate his condition; and by retaliating against him by firing him after he requested a reasonable accommodation.  Defendant has moved for summary judgment on all counts.

## DISCUSSION

A party is entitled to summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED R. CIV. P. 56(c).  To establish a genuine issue of material fact, the non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Hottenroth v. Vill. of Slinger*, 388 F.3d 1015, 1036 (7th Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In determining whether a genuine issue exists, the court draws all reasonable inferences in favor of the non-moving party.  *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1114 (7th Cir. 2009).

Plaintiff alleges that the Forest Preserve discriminated against him on the basis of his disability, failed to provide him with a reasonable accommodation, and retaliated against him for seeking an accommodation.  In order to qualify for relief under the ADA, a plaintiff must be a qualified individual with a disability.  *Weiler v. Household Finance Corp.*, 101 F.3d 519, 525 (7th Cir. 1996).  To establish this, Plaintiff must first show that his alcoholism is a "disability" within the meaning of the statute, meaning either that it is "a physical or mental impairment that substantially limits one or more [of Plaintiff's] major life activities" or that Defendant regarded him as having such an impairment.  42 U.S.C. § 12102(1)(A), (C).  If Plaintiff can establish that he was disabled, he then must show that he is a qualified individual under the ADA, meaning that he was capable of performing the essential functions of his job with or without a reasonable accommodation when he was terminated.  *Id.* § 12111(8).  The court considers these two questions in turn.

5

## I.      Disability

Defendant first argues that Plaintiff is not disabled under the meaning of the ADA and is therefore not entitled to its protections.   Defendant argues that Plaintiff's alcoholism does not constitute a disability because, once treated, it does not affect his ability to perform any major life activities.   According to Defendant, the disability determination should only be made "after taking into account mitigation measures."   *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999).[4]  Based on this standard, Defendant maintains that Plaintiff's alcoholism, when treated, did not substantially impair any of his major life activities.   In particular, Plaintiff's doctor stated that, after treatment, Plaintiff was not limited in performing major life activities, and an industrial psychologist claimed that Plaintiff was capable of performing numerous jobs.  (Def.'s 56.1 ¶¶ 19, 20.)

Defendant misapplies the *Sutton* standard, however.  In *Sutton*, the plaintiffs took corrective measures that rendered them fully capable of performing major life activities prior to meeting with the employer.   *Sutton*, 527 U.S. at 475.   The Court explicitly warned that courts should not adopt an approach that would "force [employers] to make a disability determination based on general information about how an uncorrected impairment usually affects individuals, rather than on the individual's actual condition."   *Id.* at 483.   Here, however, Plaintiff was not being treated at the time of the alleged discrimination, and the Forest Preserve was not required, under *Sutton*, to have to guess how Plaintiff would have acted if he had been treated for his alcoholism.   The court should "consider only the measures actually taken and consequences that actually follow."   *Nawrot v. CPC Int'l*, 277 F.3d 896, 904 (7th Cir. 2002) ("Those who discriminate take their victims as they find

---

        [4]        On January 1, 2009, the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553, went into effect.  Among other things, the Act "reject[s] the requirement enunciated by the Supreme Court in *Sutton* . . . that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating measures."  *Id.* at 3554. As Defendant notes, however, this law nowhere suggests that it was intended to apply retroactively, and courts "should be extremely hesitant to apply a statute retroactively."  *Bowldes v. GM Mfg. Div. of the GMC*, 411 F.3d 808, 811 (7th Cir. 2005) (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265-75 (1994)).  Therefore, the court applies the law in effect when this suit was filed.

them."). Therefore, the court looks to whether Plaintiff was disabled at the time of the alleged discrimination, not whether he could have been fully functional with treatment.

Plaintiff asserts that his alcoholism affected his major life activities of caring for himself, concentration, and maintaining social relationships. Budde's affidavit contains ample evidence of these effects. For forty-three years, Budde stated, he would drink almost every night when he got home from work, until he lost consciousness. (Pl.'s 56.1 ¶ 12.) He also suffered from frequent blackouts and had trouble sleeping. (*Id.* ¶¶ 12, 14.) He became argumentative with his wife and children, culminating in a divorce from his wife. (*Id.* ¶ 14.) He was unable to maintain his own home, and had problems with concentration. (*Id.* ¶¶ 15, 17.) Whatever success Plaintiff may have had with other life activities during this time—and it appears that he was still quite capable of performing a number of jobs during working hours—he has at least raised a genuine issue of material fact as to whether he could perform some major life activities. *See* 42 U.S.C. § 12102(1)(A) (individual is disabled if he has an "impairment that substantially limits one or more major life activities"). For purposes of this motion, then, the court assumes that Plaintiff was disabled within the meaning of the ADA during his employment with the Forest Preserve.[5]

## II.     Qualified Individual

Plaintiff is nevertheless barred from recovering under the ADA because he was fired for violating a universally applicable work rule. "It is well-established that an employee can be terminated for violations of valid work rules that apply to all employees, even if the employee's violations occurred under the influence of a disability." *Pernice v. City of Chicago*, 237 F.3d 783, 785 (7th Cir. 2001); *see also* 42 U.S.C. § 12114(c)(4). Budde violated a Standard Operating Procedure that makes clear that "all employees and members of the Department . . . may be made

---

[5]     Having concluded that a genuine issue exists as to whether Plaintiff was actually disabled, the court has no need to consider Plaintiff's alternative argument that Defendant regarded him as disabled. *See* 42 U.S.C. § 12102(1).

the subject of disciplinary action" for violating "any Federal, State, County, or Municipal law."[6] (SOP at 1.5.2.1, Ex. 18 to Budde Dep., Ex. B to Def.'s 56.1.) While Plaintiff may contend that his violation of the DUI law was caused by his alcoholism, the ADA permits employers to "hold an employee . . . who is an alcoholic to the same qualification standards for employment or job performance and behavior that [the employer] holds other employees, even if any unsatisfactory performance or behavior is related to the . . . alcoholism of such employee." 42 U.S.C. §12114(c)(4). The SOPs applied to employees across the board and clearly contemplated taking disciplinary action against those who violated them. As Chief of Police, Budde could have reasonably been expected to strictly follow the SOPs, particularly those relating to engaging in unlawful activities. In fact, Budde understood that he was held to a higher standard as an ambassador of the district. (Budde Dep. 239:11-17, Ex. B to Def.s' 56.1.) In his termination letter, Meyers informed him that he was being released, among other reasons, for "engaging in conduct that is below the standard expected for this position." (Ex. 6 to Budde Aff., Ex. B to Pl.'s 56.1.) Budde's termination was thus the result, in part, of his illegal actions, and he cannot dispute that the SOPs permit the termination of an officer—especially the Chief of Police—who receives a DUI.

Plaintiff argues that summary judgment should nevertheless be denied because a genuine issue of material fact exists as to whether Plaintiff's disability was a substantial motivating factor in Defendant's decision to terminate him. To constitute discrimination under the ADA, the disability must be a "substantial factor" in the employer's decision; "mere awareness of the plaintiff's

---

[6]     In its brief, Defendant points to a different provision of the Standard Operating Procedures that prohibits officers from being publicly intoxicated. (SOP at 1.5.2.3, Ex. 18 to Budde Dep., Ex. B to Def.'s 56.1.) Plaintiff raises a colorable defense to the charge that he violated the provision: Illinois's Right to Privacy in the Workplace Act prohibits firing an employee "because the individual uses lawful products off the premises of the employer during nonworking hours." 820 ILCS 55/5(a). The Illinois courts have not had occasion to interpret this statute, and this court declines to do so here. The SOP the court relies upon above does not implicate the statute because while the statute contemplates the use of lawful products, the SOP refers only to illegal acts.

disability, or simply thinking about it in discriminatory terms, is not enough." *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1033 (7th Cir. 1999). Plaintiff maintains that the earlier investigation into the claim that Budde was taking "liquid lunches," the February 2005 discussion between Budde and Meyers regarding parking the squad car at the Moose Lodge, and the DUI charge itself, all create a genuine issue as to whether Defendant's decision was substantially motivated by Plaintiff's addiction to alcohol. The court disagrees: the "liquid lunches" charge was retracted, and the discussion between Budde and Meyers, in which Budde stated that he eats dinner at the Lodge a few nights each week, appears to have been a low-key conversation about discretion rather than notice to Meyers of Budde's alcohol problem. Indeed, Plaintiff himself explained his frequent visits to the Moose Lodge in terms unrelated to alcohol. That leaves just the DUI charge, which is the very charge that Defendant maintains formed the basis for Plaintiff's discharge.

Plaintiff's argument essentially looks past the conduct at issue—the drunk driving incident—and contends that Defendant was not motivated to terminate him based on that conduct, but rather based on the condition that generated that conduct—his alcoholism. This approach is incorrect; even assuming "that the plaintiff's alcoholism was a partial cause of his drunk driving incident, . . . his drunk driving incident was the sole cause of his" termination. *Pernice*, 63 F.3d at 637 (citing *Despears v. Milwaukee County*, 63 F.3d 635, 636 (7th Cir. 1995) (plaintiff's "alcoholism was not the only cause of his being convicted of drunk driving. Another cause was his decision to drive while drunk.")). Indeed, even though the termination letter did not actually mention the drunk driving incident as the cause for the demotion, it was clearly the foundation for the three reasons given by Meyers (any of which, she stated, would have supported termination): a pattern of errors in judgment, his inability to drive following revocation of his license, and engaging in inappropriate conduct. All three reasons clearly implicate the drunk driving incident. Of the three, the only one that could reasonably imply that Defendant was also motivated by Plaintiff's alcoholism is the

reference to a pattern of errors in judgment. But for the reasons given above, neither the "liquid lunch" nor the Budde-Meyers discussion about the Lodge could properly be considered errors in judgment caused by alcoholism, and Plaintiff has produced no other evidence that Defendant knew of and could reasonably have been motivated by Plaintiff's alcoholism. Plaintiff cannot argue that the workplace rule against police officers—certainly including the Chief of Police—engaging in illegal activities is unreasonable, and the ADA "neither prevents employers from holding persons suffering from alcoholism . . . [to] reasonable rules of conduct, nor protects alcoholics from the consequences of their own misconduct." *Leary v. Dalton*, 58 F.3d 748, 753 (1st Cir. 1995).

Because he was terminated for violating clearly established work rules, Plaintiff is not a qualified individual with a disability entitled to protection under the ADA. Put another way, the ADA "provides no bar to discipline for employee misconduct." *Pernice*, 237 F.3d at 785.

## CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment [78] is granted.

ENTER:

Dated: March 19, 2009

_____
REBECCA R. PALLMEYER
United States District Judge

10